UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    and<br><br>THE STATE OF NORTH CARO-<br>LINA,<br><br>*ex rel.* LISA WHEELER<br><br>            Plaintiffs,<br><br>   vs.<br><br>ACADIA HEALTHCARE COM-<br>PANY, INC., et al.<br><br>         Defendants. | C/A No. 1:21-cv-00241-MR-WCM |

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
RELATOR'S AMENDED COMPLAINT**

# Table of Contents

INTRODUCTION ................................................................. 1

FACTUAL ALLEGATIONS ............................................... 2

    I.  Government Programs' Coverage of Opioid Use Disorder ..................... 2

    II. Defendants' Fraudulent Conduct and Falsification of Patient Records ..... 3

PROCEDURAL HISTORY ................................................ 6

LEGAL STANDARD ......................................................... 7

ARGUMENT...................................................................... 8

    I.  Defendants mischaracterize Relator's allegations and fail to address Relator's legal theories. ........................................... 8

    II. The Amended Complaint alleges extensive fraudulent conduct with particularity. ............................................................ 14

        A. The Amended Complaint pleads several specific false claims. .... 14

            1. The Amended Complaint contains all of the required elements of a representative claim to meet Rule 9(b)'s standard................................................................ 14

            2. Defendants' remaining arguments lack any merit. ............. 17

        B. Alternatively, the Amended Complaint alleges that Defendants engaged in a pattern of conduct that necessarily led to the submission of false claims to Government Programs................... 19

    III.The Amended Complaint alleges that Defendants' fraudulent conduct was material to Government Programs' payment of claims. .......................... 23

CONCLUSION .................................................................. 25

i

# Table of Authorities

**Page(s)**

## Cases

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................7

*Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999).......................................8, 12, 18, 25

*Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC*,
    512 F. Supp. 3d 1096 (D. Haw. 2021) ..................................12, 13

*Penguin Restoration, Inc. v. Nationwide Mut. Ins., Co.*,
    No. 5:13-CV-63-BO, 2014 WL 715123 (E.D.N.C. Feb. 21, 2014).............25

*The N.C. Farmers' Assistance Fund, Inc. v. Monsanto Co.*,
    740 F. Supp. 2d 694 (M.D.N.C. 2010).........................................19

*United States ex rel. Boise v. Cephalon, Inc.*,
    No. 08-287, 2015 WL 4461793 (E.D. Pa. July 21, 2015)............................22

*United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*,
    865 F.3d 71 (2d Cir. 2017).......................................................19

*United States ex rel. Grant v. United Airlines, Inc.*,
    912 F.3d 190 (4th Cir. 2018)....................................7, 8, 19, 20, 22

*United States ex. rel. Gugenheim v. Meridian Senior Living, LLC*,
    36 F.4th 173 (4th Cir. 2022).............................................6

*United States ex rel. Harbit v. Consultants in Gastroenterology*,
    No. 3:19-cv-03403, 2021 WL 1197124 (D.S.C. March 30, 2021) ..........7, 11

*United States ex rel. Lutz v. Berkeley Heartlab, Inc.*,
    247 F. Supp. 3d 724 (D.S.C. 2017).............................................17

Case 1:21-cv-00241-MR-WCM   Document 45   Filed 10/24/22   Page 3 of 30

*United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*,
    707 F.3d 451 (4th Cir. 2013) .............................................................8, 20, 22

*United States ex rel. Nicholson v. MedCom Carolinas, Inc.*,
    42 F.4th 185 (4th Cir. 2022) ...........................................8, 14, 17, 18, 19

*United States ex rel. Nicholson v. MedCom Carolinas*,
    No. 1:17CV34, 2020 WL 1245374 (M.D.N.C. March 16, 2020) ................16

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
    836 F.3d 770 (7th Cir. 2016) ...................................................................22, 23

*United States ex rel. Taylor v. Boyko*,
    39 F.4th 177 (4th Cir. 2022) ...................................................................23, 24

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008) ...........................................................................6

*United States v. Triple Canopy, Inc.*,
    857 F.3d 174 (4th Cir. 2017) ........................................................................24

*Universal Health Servs., Inc. v. United States*,
    579 U.S. 176 (2016) ..........................................................................11, 22, 23

## **Regulations**

42 C.F.R. § 8.11 ................................................................................................11

42 C.F.R. § 8.11(a) ...........................................................................................10

42 C.F.R. § 8.11(b)(6) ................................................................................10, 12

42 C.F.R. § 8.11(f)(7) ........................................................................................10

42 C.F.R. § 8.12 ................................................................................................11

42 C.F.R. § 8.12(a) ...........................................................................................10

42 C.F.R. § 8.12(f)(1) ........................................................................................10

iii

42 C.F.R. § 8.12(f)(4) ..................................................................................................10, 16

42 C.F.R. § 8.12(f)(5) .........................................................................................................10

42 C.F.R. § 8.12(g) .............................................................................................................10

42 C.F.R. § 410.67(b)(3) .......................................................................................................5

42 C.F.R. § 410.67(b)(4) .......................................................................................................5

42 C.F.R. § 410.67(c) ..........................................................................................................11

42 C.F.R. § 410.67(d) ............................................................................................................2

42 C.F.R. § 410.67(d)(2) .......................................................................................................9

42 C.F.R. § 410.67(d)(2)(ii) ..................................................................................................9

42 C.F.R. § 410.67(d)(3) .......................................................................................................9

42 C.F.R. § 410.67(d)(4)(i)(A) ............................................................................................12

## **Rules**

Fed. R. Civ. P. 9(b) ...............................................................................................................7

## **Other Authorities**

84 F.R. 62568-01 (Nov. 15, 2019) ........................................................................................9

iv

## **INTRODUCTION**

The United States is in the midst of a severe opioid epidemic. *Id.* at ¶¶ 144–68. In response, federal and state governments have spent billions to abate this crisis by expanding Medicare, Medicaid, and other government healthcare programs ("Government Programs") to cover opioid use disorder treatment. *Id.* at ¶¶ 168–346.

Defendant Acadia Healthcare Company, Inc. ("Acadia") "is one of the largest providers of behavioral healthcare services and addiction treatment in the United States." ECF No. 26 at ¶ 84. Most of Acadia's revenue comes from Government Programs. *Id.* at ¶¶ 96, 98–99. Yet, Acadia and its subsidiaries have repeatedly found themselves in the crosshairs of federal and state government fraud enforcement actions. *See id.* at ¶¶ 395–410. Since 2014, Acadia and CRC Health, LLC ("CRC")—an Acadia subsidiary—have paid more than $26 million to settle allegations that they knowingly submitted false claims for substance abuse treatment services. *See id.* at ¶¶ 96–99, 395, 397–408. Most recently, in 2019, Acadia and CRC signed a five-year Corporate Integrity Agreement ("CIA") with the United States. *Id.* at ¶ 408. The CIA imposes substantial compliance, reporting, and disclosure obligations and carries significant stipulated penalties and "exclusion from participation in the Federal health care programs" if Defendants violate these obligations. *Id.* at ¶¶ 409–58.

Against this backdrop, and amidst a pandemic that exacerbated the opioid epidemic, Defendants engaged in a pattern and practice of falsifying group therapy

1

records and failing to provide adequate individual therapy in both their Office Based Opioid Treatment ("OBOT") and Opioid Treatment Programs ("OTPs"). *See* ECF No. 26 at ¶¶ 483–581. The Amended Complaint details *how* Defendants executed this fraudulent scheme at the direction of "corporate." *See id.* at ¶¶ 563–65. In response, Defendants contend that Relator's claims are "fundamentally implausible," lack particularity, and are "immaterial to the Government's decision to pay." ECF No. 43-1 at 6, 11. However, Defendants' Motion both mischaracterizes Relator's claims and fails to address the legal theories underlying the Amended Complaint.

## FACTUAL ALLEGATIONS

### I. Government Programs' Coverage of Opioid Use Disorder

Medication assisted treatment ("MAT") involves the use of medications, in combination with counseling and therapy, to treat opioid addiction. *Id.* at ¶ 14. Medication is effective at controlling withdrawal symptoms and cravings; however, MAT only works if patients also receive counseling, therapy, and other non-medication services as part of a comprehensive treatment plan. *Id.* at ¶¶ 173–80.

Government Programs reimburse MAT providers in a variety of ways. For example, Medicare OTP providers are paid a weekly bundled rate that is composed of a drug component and a non-drug component. *See* 42 C.F.R. § 410.67(d). In contrast, North Carolina Medicaid reimburses providers on a fee-for-service basis. *See* ECF No. 26 at ¶¶ 262–305. But, regardless of the method of reimbursement, all MAT

providers are required to comply with stringent federal, state, and Government Program requirements. *See, e.g.,* ECF No. 26 at ¶¶ 216–233 (Medicare), 271–300 (Medicaid), 313–20 (TRICARE), 330 (Veterans Affairs), 340–46 (Federal Grants).

## II. Defendants' Fraudulent Conduct and Falsification of Patient Records

MAT patients at Defendants' facilities must receive both medication *and* behavioral health treatment. ECF No. 26 at ¶¶ 460–82. Relator, a licensed Physician Assistant, was the Assistant Medical Director at Defendants' Asheville facility from January 2014 until December 2021. *Id.* at ¶¶ 75–80. Relator was responsible for performing physical assessments of patients and prescribing appropriate doses of medication. *Id.* at ¶ 464. Relator monitored patients' treatment progress and reviewed their medical records, including their treatment plans. *See id.* at ¶¶ 464–69, 474.

Relator learned that the counselors at the Asheville facility were falsely documenting group therapy in patients' treatment records as early as September 2020. *Id.* at ¶¶ 483–84. These false notes were detailed and stated that group therapy sessions were being held in the lobby of the Asheville facility, on the sidewalk outside of the Asheville facility, or by telephone. *Id.* at ¶¶ 487–88, 493. However, during this time, Defendants *never* held group therapy in *any* setting. *Id.* at ¶¶ 484–86, 490.

After reviewing her patients' records, Relator learned that the Asheville facility was reusing identical falsified group therapy records for different patients. *See id.* at ¶¶ 493–506. Sometimes Defendants even recycled the same group therapy note

3

for the same patient on different dates. *See id.* (providing a representative example). But *none* of these group therapy sessions occurred. Defendants simply reused pre-prepared and fraudulent notes to give the illusion they were providing group therapy. *See id.* at ¶¶ 506–13. Defendants escalated their fraud in March 2021 by implementing "bibliotherapy," in which patients filled out worksheets on topics that were *identical* to the prior falsified group therapy notes. *Id.* at ¶ 514-16, 519-21, 525-31.

In June 2021, Relator learned that the Asheville facility's Clinical Manager, Matt Lawson, was emailing template group therapy notes to counselors every week. *Id.* at ¶¶ 532–36. The counselors then pasted the template group therapy notes into patients' medical records. *Id.* at ¶ 534. This wholesale falsification of group therapy notes is a corporate policy that is monitored by Acadia. *See id.* at ¶¶ 563–69. For example, on July 6, 2021, Lawson emailed counselors a false group therapy note. *Id.* at ¶ 563. A short time later, he sent a follow-up email telling counselors to disregard the prior email and use a shorter false group therapy note. *Id.* at ¶ 564. The stated reason was that: "*Corporate wants less detail.*" *Id.* at ¶ 565 (emphasis added).

Moreover, Relator has personal knowledge that this fraud was not limited to the Asheville facility. The Medical Director of Defendants' North Wilkesboro facility ("Director") told Relator that it was also using falsified group therapy notes. *Id.* at ¶ 572. Both Relator and the Director reported this fraud to Defendants. *Id.* at ¶¶ 572–80. Specifically, Relator reported the fraud to Clinic Director Jason Hines in

4

March 2021, May 2021, and July 2021. *Id.* at ¶¶ 574–80. Hines took no corrective action and, instead, told Relator that the fraud was occurring at Defendants' other North Carolina facilities and that Defendants' Regional Director, Jessica Tighe, stated that Relator should "stay in her lane." *Id.* at ¶¶ 573–78.

Additionally, Defendants failed to provide legally adequate individual therapy. *Id.* at ¶¶ 550–59. During the COVID-19 pandemic, the Asheville facility conducted non-contact individual therapy sessions. *Id.* at ¶ 551. But Defendants made no attempt to ascertain whether patients had the ability to attend therapy in person or by video.[1] *Id.* at ¶ 552. Instead, Defendants directed the Asheville facility to *only* perform individual therapy by telephone, resulting in counselors having brief phone calls with patients where no therapy or counseling occurred. *Id.* at ¶¶ 550–56. As a result, many patients at the facility were left without *any* individual *or* group therapy.

Nonetheless, Defendants billed Government Programs for OTP and OBOT services. *Id.* at ¶¶ 408–09, 513, 549, 557, 581–744. And, because of Defendants' fraudulent inducement and materially false statements, records, and certifications, Government Programs paid these claims. *Id.* Relator's Amended Complaint contains detailed allegations that lead to the inescapable conclusion that Defendants knowingly engaged in a pattern and practice of fraudulent conduct that necessarily led to

---

[1] Under federal law, "audio-only telephone calls" are *only* permitted "[d]uring a Public Health Emergency . . . in cases where audio/video communication technology is not available to the beneficiary . . . ." *See* 42 C.F.R. § 410.67(b)(3), (4).

5

the submission of false claims to Government Programs. Moreover, the Amended Complaint contains a representative example of a dual eligible Medicare and Medicaid beneficiary—Patient 6. *See id.* at ¶¶ 582–637. These allegations detail the time, place, and contents of Defendants' false representations as to Patient 6 and allege what Defendants obtained by these false representations. *See id.* Accordingly, Relator has alleged with particularity "the who, what, when, where, and how of the alleged fraud." *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks omitted).

## PROCEDURAL HISTORY

On September 10, 2021, Relator filed a Complaint, alleging violations of the False Claims Act ("FCA"), against Defendants. ECF No. 2. On June 2, 2022, the Government declined to intervene. ECF Nos. 17, 18. Relator then filed an Amended Complaint against the same Defendants. ECF No. 26. The Amended Complaint alleges the following FCA causes of action: **(1)** Presenting False Claims; **(2)** Using False Records or Statements Material to a False Claim; **(3)** FCA Conversion; **(4)** Express and Implied False Certifications; **(5)** Fraudulent Inducement; and **(6)** Reverse False Claims. *Id.* at ¶¶ 745–801. Additionally, Relator alleged corresponding claims under the North Carolina False Claims Act.[2] *Id.* at ¶¶ 802–11.

---

[2] These claims are analyzed in the same manner as Relator's FCA claims. *See United States ex. rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 179 n.2 (4th Cir. 2022).

6

Defendants filed a Motion to Dismiss, which contends: (1) "Relator's allegations regarding group billing and the CIA are not plausible on their face"; (2) "[t]he Amended Complaint fails to allege fraud with particularity"; and (3) "[t]he Amended Complaint fails to show that the alleged false representations were material to the government's decision to pay any claim." ECF No. 43-1 at 2. But Defendants' Motion mischaracterizes Relator's claims and fails to address several causes of action.

## LEGAL STANDARD

"Generally, a complaint will survive a Rule 12(b)(6) motion to dismiss if it 'state[s] a claim to relief that is plausible on its face,' meaning that it pleads sufficient facts to support a 'reasonable inference that the defendant is liable for the misconduct alleged.'" *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 196 (4th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). However, fraud-based claims—including most claims arising under the FCA[3]—must satisfy Federal Rule of Civil Procedure 9(b), which requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

---

[3] FCA conversion claims are not subject to Rule 9(b)'s heightened pleading standard. *See United States ex rel. Harbit v. Consultants in Gastroenterology*, No. 3:19-cv-03403-JMC, 2021 WL 1197124, at *7 (D.S.C. March 30, 2021) (holding that Rule 8's pleading standard applies because "Defendants' knowledge is the determinative factor for a FCA conversion claim, and not any alleged fraud"). The Amended Complaint alleges FCA conversion in Count III. ECF No. 26 at ¶¶ 763–70.

There are two ways a relator can satisfy Rule 9(b)'s particularity requirement. *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 194 (4th Cir. 2022). First, a relator can allege "a representative example describing the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby . . . ." *Id.* (quotation omitted). Alternatively, a relator "can allege a pattern of conduct that would '*necessarily* have led[] to submission of false claims' to the government for payment." *Grant*, 912 F.3d at 197 (quoting *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 457 (4th Cir. 2013)). Under either alternative, "'[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial pre-discovery evidence of those facts.'" *Nicholson*, 42 F.4th at 195 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

## ARGUMENT

### I. Defendants mischaracterize Relator's allegations and fail to address Relator's legal theories.

Defendants first argue that Relator fails to state a plausible claim for relief because "neither Medicare nor Medicaid requires group therapy", "Medicare's bundled payment system does not make it possible to bill for group therapy," and Relator's CIA-related claims "defy common sense" in light of the "highly regulated

8

healthcare environment in which Defendants operate . . . ." ECF No. 43-1 at 11. These arguments mischaracterize Relator's allegations, and Defendants' failure to address Relator's well-pled legal theories permeates their Motion to Dismiss.

The Amended Complaint acknowledges that Defendants do not have to provide group therapy to every Medicare (or Medicaid) patient every week. *See* ECF No. 26 at ¶¶ 236–305. The Centers for Medicare and Medicaid Services ("CMS") initially promulgated a proposed regulation that would have only permitted providers to bill Medicare for a weekly bundle of treatment services if a patient received at least 51% of the services in her treatment plan. *See* 84 F.R. 62568-01, 62641 (Nov. 15, 2019). In response to public comments, CMS adopted a regulation that only required one treatment service be provided during a weekly episode of care to submit a "bundled bill."[4] *See* 42 C.F.R. § 410.67(d)(3). However, CMS cautioned providers that it "will be monitoring for abuse" because of the "lower threshold for billing for fully weekly bundled payment[s]." 84 F.R. at 62642.

To that end, Defendants' OBOTs and OTPs are subject to stringent federal and state statutes, regulations, standards, certifications, and accreditations. *See, e.g.,* ECF No. 26 at ¶¶ 216–346. Importantly, OTPs must provide treatment in accordance with

---

[4] Medicare's bundled rate includes a drug and non-drug component. 42 C.F.R. § 410.67(d)(2). The non-drug component includes the reimbursement rates for, *inter alia*, individual and group therapy. *Id.* § 410.67(d)(2)(ii).

the Federal Opioid Treatment Standards ("Federal Standards") "and must comply with these standards as a condition of certification." 42 C.F.R. § 8.12(a). The Federal Standards are extensive and, *inter alia*, require OTPs to:

- "[P]rovide adequate medical, counseling, vocational, educational, and other assessment and treatment services" and "be able to document that these services are fully and reasonably available to patients." *Id.* § 8.12(f)(1).

- Assess each patient upon admission and periodically "to determine the most appropriate combination of services and treatment." *Id.* § 8.12(f)(4).

- Prepare and update a treatment plan that contains "the medical, psychosocial, economic, legal, or other supportive services that a patient needs" and identifies "the frequency with which these services are to be provided." *Id.*

- "[P]rovide adequate substance abuse counseling to each patient as clinically necessary" in order "to contribute to the appropriate treatment plan for the patient and to monitor patient progress." *Id.* § 8.12(f)(5).

- "[E]stablish and maintain a recordkeeping system that is adequate to document and monitor patient care." *Id.* § 8.12(g).

Moreover, federal law requires OTPs to be certified by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), which means "an OTP must meet the Federal [Standards], must be the subject of a current, valid accreditation by an accreditation body or other entity designated by SAMHSA, and must comply with any other conditions for certification established by SAMHSA." *Id.* § 8.11(a). The SAMHSA certification application must contain a statement that the OTP will "operate in accordance with Federal [Standards] and approved accreditation elements." *Id.* at § 8.11(b)(6), (f)(7). Thus, an OTP *must* receive this certification

10

and accreditation *and* comply with the Federal Standards in order to participate in, and bill, Government Programs. *See id.* § 410.67(c); *see also id.* §§ 8.11, 8.12.

These requirements serve as built-in guardrails to ensure that Defendants are eligible to participate in Government Programs, comply with Federal Standards, and do not obtain payment for services that were not provided to patients. They also form the primary basis for three of Relator's legal theories: (1) express and/or implied false certifications; (2) conversion; and (3) fraudulent inducement. *See* ECF No. 26 at 745–91 (Counts I–V). The Amended Complaint makes straightforward allegations as to these claims, which can be summarized as follows:

- **False Certifications:** Defendants knowingly made materially false certifications of compliance with: **(1)** federal law, regulations, and treatment standards; **(2)** North Carolina law; **(3)** SAMHSA certification and accreditation requirements; **(4)** their provider agreements; and **(5)** the CIA. *See* ECF No. 26 at ¶¶ 639–744 (detailing Defendants' false certifications). These allegations plausibly state an FCA claim for false certification with particularity. *See, e.g., Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 180 (2016) [hereinafter "*Escobar*"] (holding that a defendant that fails to disclose noncompliance "with a statutory, regulatory, or contractual requirement [that is] material to the Government's payment decision" has violated the False Claims Act).

- **Conversion:** Defendants knowingly and unlawfully retained Government Program funds despite failing to provide group therapy, falsifying records, and providing inadequate individual therapy. *See* ECF No. 26 at ¶¶ 763–70. These allegations plausibly state a claim for FCA conversion.[5] *See Harbit*, 2021 WL 1197124, at *7 (applying Rule 8 and finding sufficient allegations that "Defendants failed to remit funds collected from the Government on false pretenses, causing a lower amount of federal funds available to others").

---

[5] Even if the Court applies Rule 9(b) to this claim, the Amended Complaint's detailed allegations are sufficiently particular.

- **Fraudulent Inducement:** Defendants devised a scheme to falsify group therapy records and fail to provide individual therapy to induce SAMHSA, CARF, and Government Programs to certify, accredit, and contract with Defendants. *See, e.g.,* ECF No. 26 at 683–99 (alleging that "Defendants signed statements," pursuant to 42 C.F.R. § 8.11(b)(6), that the Asheville and North Wilkesboro facilities "would comply with the conditions of its OTP certification"); *id.* at ¶ 784–91. These allegations plausibly state an FCA claim for fraudulent inducement with particularity. *See Harrison*, 176 F.3d at 787 (recognizing this legal theory "when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct.").

Defendants' Motion fails to address these claims *in any way*. The Motion does not contain the words "induce" or "inducement," and its only reference to "certifications" is in a footnote in its materiality argument. *See* ECF No. 43-1 at 28 n.8. Similarly, Defendants' only discussion of Relator's conversion claim is in a footnote related to penalties under the CIA. *See id.* at 23 n.7. Instead, Defendants summarily argue that Relator's claims are not plausible because group therapy is not required for every Medicare or Medicaid patient and cannot be billed to Medicare as a stand-alone item.[6] But those arguments fail to actually address Relator's *legal claims*.[7]

---

[6] In fact, Defendants *can* submit claims to Medicare for OTP group therapy via add-on codes. *See* 42 C.F.R. § 410.67(d)(4)(i)(A) (allowing providers to bill for "[c]ounseling or therapy services in excess of the amount specified in the beneficiary's treatment plan and for which medical necessity is documented in the medical record"); ECF No. 26 at ¶ 257. Moreover, Medicare reimburses providers for group therapy provided with OBOT services—an issue that Defendants' Motion fails to address.

[7] Defendants cite *Torricer* to argue that deficiencies in bundled billing cannot be a false claim. But *Torricer* dealt with faulty dialysis plans of care ("POCs"), which are not services reimbursed in a bundled payment. *Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC*, 512 F. Supp. 3d 1096, 1123 (D. Haw. 2021) ("POCs . . . are not an item reimbursable under the bundled-payment system . . . . POCs document

12

Additionally, Relator has alleged with particularity that Defendants directly presented false claims for OTP *and* OBOT services to Government Programs that reimburse providers for group therapy on a fee-for-service basis. *See id.* at ¶¶ 348–93 (detailing Defendants' presentment of false OTP *and* OBOT services to various Government payors). These claims far exceed Rule 8 and 9(b)'s pleading standards.

Finally, Defendants' arguments as to the plausibility of Relator's CIA-related claims fail for similar reasons. Incredibly, Defendants ask the Court to disregard these claims because they "defy common sense" when "viewed in the context of the highly regulated healthcare environment in which Defendants operate." ECF No. 43-1 at 14. This argument is fundamentally flawed. Relator does not simply "*believe[]* that group therapy was not provided." ECF No. 43-1 at 14. She has personal knowledge that no group therapy was provided and pleads examples of Defendants' falsified group therapy records. *See, e.g.,* ECF No. 26 at ¶¶ 595–610 (providing identical, fraudulent group therapy notes signed by *different* counselors on *different* dates for *different* patients). Moreover, CIAs have penalty provisions for a reason: Medical providers sometimes continue to commit fraud despite being subject to a CIA. Respectfully, the Court should reject Defendants' naked assurances that they could not have committed fraud because they were subject to Government oversight.

---

the treatment plan; they are not the treatment itself."). In contrast, Defendants are falsifying treatments *included* in a "bundled bill" and falsely certifying that they performed these treatments in compliance with Federal Standards.

**II. The Amended Complaint alleges extensive fraudulent conduct with particularity.**

Next, Defendants contend that the Amended Complaint fails to allege fraud with particularity. Relator can satisfy Rule 9(b) one of two ways: (1) by alleging a representative example; or (2) "alleging a pattern of conduct that would *necessarily* have led to submission of false claims." *Nicholson*, 42 F. 4th at 194 (internal quotations omitted). Relator's detailed Amended Complaint satisfies *both* alternatives.

**A. The Amended Complaint pleads several specific false claims.**

In order to adequately plead presentment under Rule 9(b) by using a representative example, Relator must "describe[e] the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby . . . ." *Id.* at 194. Here, after pleading hundreds of paragraphs detailing Defendants' scheme to defraud Government Programs, the Amended Complaint provides a representative example of a dual eligible Medicare and Medicaid beneficiary—Patient 6. ECF No. 26 at ¶¶ 582–637.

**1. The Amended Complaint contains all of the required elements of a representative claim to meet Rule 9(b)'s standard.**

Patient 6 is a Medicare and Medicaid beneficiary in the Asheville facility's OTP. ECF No. 26 at ¶¶ 582–84. His initial treatment plan stated that he "will participate in all program counseling requirements." *Id.* at ¶ 585. During a May 19, 2021, appointment, he told Relator that has never participated in any group therapy at the

14

Asheville facility. *Id.* at ¶¶ 589, 590–92. But, after reviewing his medical records, Relator discovered that they contained numerous group therapy notes. *Id.* at ¶¶ 593–94. For example, his records contain a group therapy note from April 7, 2021, that was signed by Counselor Shawn Landreth. *Id.* at ¶¶ 595–99. The note recounts a "continuous lobby group" and describes interactions between Landreth and group members, such as: "Some of the clients in the group discussed the fact they were doing these things and others discussed trying to in the coming week. One client *on the line*[8] stated he goes for walks and leaves his phone at home just 'to get away from the noise[.]'" *See id.* at ¶¶ 597–98 (emphasis added).

This group therapy session did not occur, and Relator discovered that Defendants had been using this fraudulent group therapy note for many other patients. *Id.* at ¶ 599. Defendants' records show that three counselors signed ten identical copies of this note for eight different patients on seven different dates between January 26, 2021 and April 13, 2021. *See id.* at ¶¶ 600–09. Moreover, two patients' medical records contain this identical note—signed by different counselors—for two consecutive weeks. *Id.* at ¶¶ 606–15. Patient 6's medical records also contain falsified group therapy notes for April 15, 2021; April 21, 2021; and April 28, 2021. *Id.* at ¶ 618.

On July 13, 2021, a counselor met with Patient 6 to update his treatment plan. *Id.* at ¶ 622. Patient 6 expressed interest in group therapy "and reported success with

---

[8] A "lobby group" session would not have participants attending telephonically.

them in the past." *Id.* at ¶ 625. Accordingly, the counselor updated Patient 6's treatment plan to state that he could benefit from group therapy, but the treatment plan did not state the frequency with which he should receive group therapy. *Id.* at ¶¶ 626–28; *see* 42 C.F.R. § 8.12(f)(4) (requiring treatment plans to "identify the frequency with which" psychosocial services are to be provided).

All told, Patient 6 received <u>no group therapy</u>. *Id.* at ¶¶ 592, 629. Yet, Defendants submitted bills to Medicare and Medicaid for OTP services during every week in April 2021 and the week of May 19, 2021. *Id.* at ¶¶ 630–31, 636. The Amended Complaint also alleges that Medicare and Medicaid paid these claims, unaware of the falsity of Defendants' materially false certifications. *Id.* at ¶ 633–37.

In sum, Relator has pled all of the requirements of a representative example:

- **Time:** Defendants made false representations and certifications when submitting claims for Patient 6's treatment during every week in April 2021 and the week of May 19, 2021.[9] *Id.* at ¶¶ 591, 595, 618, 629–37.

- **Place:** Defendants' Asheville facility. *Id.* at ¶¶ 582–83.

- **Contents:** "Defendants expressly and/or impliedly certified to the United States and the State of North Carolina that they were in compliance with Patient 6's treatment plan; Federal and State law, OTP regulations, statutes, and

---

[9] Defendants claim that a Relator must allege the "precise day" that claims were submitted, *see* ECF No. 43-1 at 17, comes from the District Court's Order in *Nicholson* and was *not* adopted by the Fourth Circuit. *See United States ex rel. Nicholson v. MedCom Carolinas*, No. 1:17CV34, 2020 WL 1245374, at *8 (M.D.N.C. March 16, 2020). However, even the District Court held that a relator *can* plead a representative example absent alleging the "precise day" a claim was submitted. *See id.* (citing cases that satisfied Rule 9(b) despite *not* pleading the "precise day").

16

standards, SAMHSA certification requirements; CARF accreditation requirements; their Provider Agreements; and the CIA." *Id*. at ¶ 633. These certifications were material to Defendants' eligibility to participate in Government Programs and to the submission of individual claims. *See id.* at ¶¶ 639–744 (detailing the false certifications Defendants made to Government Programs); *see also id.* at ¶¶ 739–40 (alleging that "[c]ompliance with these standards, contracts, laws, regulations, certifications, and accreditations" are conditions of participation in Government Programs and conditions of payment).

- **Identity:** Defendants made false representations and certifications to Medicare and Medicaid at the direction of Defendant Acadia. *Id.* at ¶¶ 349–62, 363–72, 513, 549, 630–37; *see United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 247 F. Supp. 3d 724, 732 (D.S.C. 2017) (holding that neither "the FCA nor Rule 9(b) require the identification of individuals within a defendant corporation" because corporations are "persons" under the FCA).

- **What Defendants Obtained:** Defendants obtained payments for OTP services provided to Patient 6 for every week of April 2021 and the week of May 19, 2021. ECF No. 26 at ¶¶ 635–37. Specifically, the Amended Complaint alleges that Patient 6 receives Methadone and the weekly Medicare reimbursement rate for this is $215.67. *Id.* at ¶¶ 258(a), 582.

## 2. Defendants' remaining arguments lack any merit.

Defendants ask the Court to disregard the detailed allegations as to Patient 6 for three reasons. *First*, Defendants contend that the Fourth Circuit's recent decision in *Nicholson* "highlights what the Amended Complaint lacks." ECF No. 43-1 at 15. But *Nicholson* actually demonstrates why the Amended Complaint far exceeds Rule 9(b). There, the Court was reviewing the sufficiency of "a confusing set of allegations" about an Anti-Kickback scheme. *Nicholson*, 42 F.4th at 190; *see id.* at 191. The complaint was "largely made up of conclusory allegations" and omitted "many

important details," including the names of participants, the location of key events, and even the proper identity of the defendant. *See id.* at 189, 191.

The Court held that "[c]laiming to know something based on working in an undisclosed role at the relevant company, based on discussions with unnamed people, and based on participation in vaguely described events cannot make a series of conclusory legal statements into a particularized allegation." *Id.* at 195–96. While the relator attempted to plead a "representative claim" in one sentence of the complaint, the Court held that the allegation "sounds like a neighbor's conversation only half overheard through the walls." *Id.* at 196. Therefore, the Court held that the "story simply does not give us any confidence that Nicholson 'has substantial prediscovery evidence of [these] facts.'" *Id.* (quoting *Harrison*, 176 F.3d at 784).

Here, however, Relator's allegations about Patient 6 are far more detailed and particular than the confusing and conclusory allegations in *Nicholson*. As detailed above, the Amended Complaint includes the identities of all participants, the time, place, and contents of Defendants false representations, and what Defendants obtained as a result. Relator's Amended Complaint includes 56 paragraphs of allegations specific to Patient 6. ECF No. 26 at ¶¶ 582–637. These allegations are buttressed by more than 675 other paragraphs of factual allegations that detail Defendants' fraudulent scheme. *See Nicholson*, 42 F.4th at 196 (encouraging relators to "err on the side of saying too much to avoid a kick from Rule 12(b)(6)").

*Second*, Defendants argue that any allegations made "upon information and belief" should be disregarded. *See* ECF No. 43-1. But that is not the law in the Fourth Circuit. *See, e.g., The N.C. Farmers' Assistance Fund, Inc. v. Monsanto Co.*, 740 F. Supp. 2d 694, 705 (M.D.N.C. 2010) (holding that Rule 9(b) permits pleading "upon information and belief" when the "essential information lies uniquely within another party's control . . . if the pleading sets forth the specific facts upon which the belief is reasonably based" (internal quotation omitted)); *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 (2d Cir. 2017) (holding Rule 9(b) does not elevate the standard of certainty beyond the ordinary level of plausibility or "forbid pleading upon information and belief").

*Finally*, Defendants claim that Relator is required to plead a representative example from *every* Government Program, including TRICARE, VA, and Cures Act grants. ECF No. 43-1 at 13 n.3. Defendants have offered no legal support for this argument—nor can they—because it is not an accurate statement of Fourth Circuit law. When a relator pleads a representative example of her claims with particularity, Rule 9(b) has been satisfied. *See Nicholson*, 42 F.4th at 194.

### B. Alternatively, the Amended Complaint alleges that Defendants engaged in a pattern of conduct that necessarily led to the submission of false claims to Government Programs.

When a relator does not plead a representative example, she can nonetheless satisfy Rule 9(b) by alleging "a pattern of conduct that would '*necessarily* have led[]

to submission of false claims' to the government for payment." *Grant*, 912 F.3d at 197 (quoting *Nathan*, 707 F.3d at 457). Relators are not required "to produce documentation or invoices at the outset of the suit," nor are "employees who do not have specific knowledge of a company's financial and billing structure precluded from adequately pleading FCA claims . . . ." *Id.* at 199. Instead, a relator is only required to "connect the dots, even if unsupported by precise documentation, between the alleged false claims and government payment." *Id.*

The Amended Complaint details Defendants' scheme to falsify records and not provide group therapy or legally adequate individual therapy. *See* ECF No. 26 at ¶¶ 460–637. It alleges that "[m]any of the Asheville facility's patients are beneficiaries of Government Healthcare Programs, including Medicare, Medicaid, TRICARE, VA, and Cures Act Grants." *Id.* at ¶ 463. It also explains how Defendants submit claims to Government Programs, alleges Defendants submitted false claims, and avers that Government Programs paid the claims based on Defendants' false statements, representations, and certifications. *See id.* at ¶¶ 199–346, 348–93, 460–637.

The Amended Complaint also contains detailed and specific allegations that Defendants' fraud was widespread and the result of a corporate policy. For example, after Relator reported Defendants' fraud, the Asheville facility's Clinic Director told Relator that the falsification of records "was occurring at other North Carolina locations, including Defendants' Pinehurst and Fayetteville locations." ECF No. 26 at

20

¶¶ 573–75. Similarly, the North Wilkesboro Medical Director also told Relator that group therapy notes were being falsified at that facility. *Id.* at ¶ 572. Most importantly, Defendants' records indicate that "corporate"—i.e., Defendants Acadia and CRC—were directing and actively monitoring the fraudulent conduct. *See id.* at ¶¶ 563–67 ("Corporate wants less detail").

In response, Defendants claim that there is a "near certainty" that no false claims were submitted to Government Programs. ECF No. 43-1 at 19. But this argument is premised on a fundamental mischaracterization of Relator's claims. Defendants' argument that false claims were impossible because Government Programs do not require group therapy and Medicare uses "bundled billing" are irrelevant due to the nature of Relator's legal claims. The Amended Complaint pleads straightforward FCA claims: **(1)** presentment of false claims to Government Programs that reimburse on a fee-for-service basis; **(2)** the creation and use of false records and statements material to false claims; **(3)** conversion; **(4)** express and/or implied false certifications; **(5)** fraudulent inducement; and **(6)** reverse false claims.

The legal and factual basis of these claims are addressed in detail in the Amended Complaint and above. Although Defendants fail to address most of these claims, they do vigorously contest the relevance of the CIA to Relator's claims. The CIA is manifestly relevant to understanding the severity of Defendants' fraudulent conduct. But it is also directly relevant to two of Relator's legal claims.

21

*First*, each time Defendants submitted a claim for individual or group therapy, they falsely certified that they were complying with the CIA. *See id.* at ¶¶ 720–37. Yet, they breached the CIA in several respects, including by failing to take *any* action in response to Relators reports of fraud. *See id.*; *see Escobar*, 579 U.S. at 180 (holding a defendant's failure to disclose noncompliance with a material contractual requirement violates the FCA). *Second*, Defendants' obligation to pay stipulated penalties arose when they breached the CIA's reporting and certification requirements and failed to refund Government Programs for services that were not performed. *See* ECF No. 26 at ¶¶ 422–47, 795–99. Therefore, Defendants knowingly avoided an obligation to pay money to the Government. *See United States ex rel. Boise v. Cephalon, Inc.*, No. 08-287, 2015 WL 4461793, at *6–7 (E.D. Pa. July 21, 2015) (holding relators stated a claim under 31 U.S.C. § 3729(a)(1)(G) because the defendant had an "established duty" to pay stipulated penalties when it breached a CIA).

At bottom, the Amended Complaint's allegations "connect the dots" between Defendants' fraudulent conduct and reimbursement by Government Programs. *See Grant*, 912 F.3d at 199. The Amended Complaint is far more detailed than the "inherently speculative" allegations in the cases cited by Defendants. *See, e.g., Nathan*, 707 F.3d at 461. Instead, Relator has pled "an integrated scheme in which presentment of a claim for payment was a necessary result." *Id.*; *see also United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 778 (7th Cir. 2016)

22

(concluding that a relator satisfied Rule 9(b) and holding: "Considering [her] position as a [midlevel provider], a position that does not appear to include regular access to medical bills, we do not see how she would have been able to plead more facts pertaining to the billing process.").

### III. The Amended Complaint alleges that Defendants' fraudulent conduct was material to Government Programs' payment of claims.

Finally, Defendants contend that the Amended Complaint "fails to sufficiently allege materiality." ECF No. 43-1 at 26. "Materiality, like other non-scienter elements of a False Claims Act claim, must be pleaded with particularity under Rule 9(b)." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 190 (4th Cir. 2022). "If a relator is alleging fraud under an implied-certification theory based on statutory, contractual, or regulatory noncompliance, failure to follow a 'minor or insubstantial' requirement will not suffice to show materiality." *Id.* (quoting *Escobar*, 579 U.S. at 194). Instead, a relator must allege that the provision at issue is "'so central' to the services provided that the Government 'would not have paid these claims had it known of these violations.'" *Id.* (quoting *Escobar*, 579 U.S. at 196).

Here, Relator has alleged that each of Defendants' false statements, records, and certifications were material to the Government Programs' payment decisions. *See* ECF No. 26 at ¶¶ 634, 650, 655, 660, 674, 681, 699, 711, 719, 737, 742–43, 757, 776, 785, 798, 809. These allegations are far from conclusory, are well supported by Relator's detailed factual allegations, and unequivocally assert that the Government

23

Programs would not have paid the claims at issue if they were aware of the falsity of Defendants' statements, records, and certifications. *See id.*

As detailed above, Relator's false certification claims are premised on Defendants' false certifications to Government Programs that they were complying with, *inter alia*, Federal Standards and the CIA. *See id.* at ¶¶ 656–744. Relator has alleged that Defendants engaged in a corporate-driven fraudulent scheme to falsify records to give the illusion that they were providing a service that is reimbursable by Government Programs. That is precisely the type of conduct that the Fourth Circuit has found to be material. *See, e.g.*, *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017) (finding a defendant's omissions "material for two reasons: common sense and [defendant's] own actions in covering up the noncompliance").

In a last-ditch attempt at dismissal, Defendants falsely represent that "[t]he Government's election not to intervene in this action also weighs against a finding of materiality." ECF No. 43-1 at 29 n.9. This argument has been expressly rejected by the Fourth Circuit. *See Taylor*, 39 F.4th at 194 (holding that reliance on the Government's decision not to intervene "was error" because there are many reasons why the Government may decide not to intervene and instructing courts not to "presume lack of materiality"). Accordingly, the Court should conclude that Relator's materiality allegations are more than sufficient under *Escobar*. Resolution of the materiality issues in this case will be fact-intensive and can only be resolved after discovery.

## **CONCLUSION**

In sum, Relator's Amended Complaint satisfies Rule 9(b)'s particularly re-
quirement by pleading a representative example and a pattern of conduct that neces-
sarily led to the submission of false claims. *See Harrison*, 176 F.3d at 784 (stating
that courts should "hesitate to dismiss a complaint under Rule 9(b)" if the defendant
has "been made aware of the particular circumstances for which she will have to
prepare a defense at trial" and "that plaintiff has substantial prediscovery evidence
of those facts"). Moreover, because Defendants' Motion to Dismiss fails to address
many of Relator's legal claims, the Court should construe the Motion as a partial
motion to dismiss[10] and reject Defendants' limited arguments on the merits.

Respectfully submitted this 24th day of October, 2022,

**LAW OFFICES OF JAMES**
**SCOTT FARRIN**
By:      /s/ Gary W. Jackson
Gary W. Jackson (NC Bar No. 13976)
Kaitlyn E. Fudge (NC Bar No. 54829)
280 South Mangum Street, Suite 400
Durham, North Carolina 27703
Telephone: (919) 688-4991

**LAW OFFICE OF BILL**
**NETTLES**
William N. Nettles
Frances C. Trapp
John L. Warren III
2008 Lincoln Street
Columbia, South Carolina 29201
Telephone: (803) 814-2826
(*Admitted Pro Hac Vice*)

*Attorneys for Plaintiff-Relator*

---

[10] Additionally, the Court should reject any attempt by Defendants to cure their in-
complete Motion to Dismiss in a reply brief. *See Penguin Restoration, Inc. v. Na-
tionwide Mut. Ins., Co.*, No. 5:13-CV-63-BO, 2014 WL 715123, at *1–2 (E.D.N.C.
Feb. 21, 2014) (striking new issues raised in a reply brief that could have been raised
in the initial motion to dismiss).

25