IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:21-cv-00241-MR-WCM

| | |
|---|---|
| LISA WHEELER, | ) |
| | ) |
| Plaintiff-Relator, | ) |
| v. | ) |
| | )     MEMORANDUM |
| ACADIA HEALTHCARE COMPANY, INC.; | )     AND |
| CRC HEALTH, LLC; | )     RECOMMENDATION |
| and ATS OF NORTH CAROLINA, LLC | ) |
| *doing business as* | ) |
| Mountain Health Solutions Asheville | ) |
| *doing business as* | ) |
| Asheville Comprehensive Treatment Center | ) |
| *doing business as* | ) |
| Mountain Health Solutions | ) |
| North Wilkesboro | ) |
| *doing business as* | ) |
| North Wilkesboro Comprehensive | ) |
| Treatment Center | ) |
| | ) |
| Defendants. | ) |
| ———————————————— | ) |

This matter is before the Court on a Motion to Dismiss filed by
Defendants Acadia Healthcare Company Inc. ("Acadia"), ATS of North
Carolina LLC ("ATS"), and CRC Health LLC ("CRC") (Doc. 43). The Motion has
been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a
recommendation.

1

## I. Relevant Procedural Background

On September 10, 2021, Lisa Wheeler ("Relator"), on behalf of the United States of America and the State of North Carolina filed her original Complaint, under seal, naming Acadia, ATS, and CRC (collectively, "Defendants"). Doc. 2.

On June 2, 2022, the United States of America and the State of North Carolina (the "Governments") filed a Notice of Election to Decline Intervention and Motion to Unseal Complaint. Doc. 17.

On June 7, 2022, the Governments' motion was granted, and Relator was directed to serve the complaint on Defendants within ninety days, in the event she elected to proceed with this action. Doc. 18.[1]

On August 1, 2022, Relator filed an Amended Complaint. Doc. 26.

On September 16, 2022, Defendants filed the Motion to Dismiss with a supporting memorandum. Docs. 43, 43-1.

Relator has responded in opposition and Defendants have replied. Docs. 45, 47. A hearing on the Motion was conducted on June 14, 2023, following which the Motion was taken under advisement. This Memorandum now follows.

---

[1] Certain filings made prior to the Governments' motion remain sealed.

## II. Relator's Allegations

Relator seeks to recover, on behalf of the Governments and pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA") and the North Carolina False Claims Act, N.C.G.S. § 1-607, *et seq.* (the "NC FCA"), "losses from allegedly false claims submitted to Medicare, Medicaid, TRICARE, the Department of Veterans Affairs, the North Carolina Department of Health and Human Services ('NC DHHS'), and other state and federal healthcare programs (collectively, 'Government Healthcare Programs')" as a result of Defendants' fraudulent conduct. Doc. 26 at 1-2. Specifically, the Amended Complaint alleges as follows:

### A. The Defendants

Acadia provides addiction treatment and behavioral healthcare services throughout the United States. Id. at ¶ 83. Approximately sixty-five percent (65%) of Acadia's annual revenue comes from Medicare and Medicaid. Id. at ¶ 99.

Relator alleges, upon information and belief, that CRC is a wholly owned subsidiary of Acadia which provides substance abuse treatment services for Acadia through CRC's subsidiary companies. Id. at ¶¶ 107, 108.[2]

---

[2] According to the Amended Complaint, Acadia acquired CRC in October of 2014. Id. at ¶ 106.

ATS, in turn, is a subsidiary of both Acadia and CRC and operates substance abuse treatment facilities in North Carolina, including in Asheville and North Wilkesboro. Id. at ¶¶ 121, 122.

### B. Payment for Medication-Assisted Treatment

One of the primary services offered by Defendants for the treatment of Opioid Use Disorder is "Medication-Assisted Treatment" ("MAT"), which involves the use of medications in combination with counseling and therapy. Id. at ¶¶ 13, 14, 173, 174. MAT may be provided in a "variety of settings," including Office Based Opioid Treatment ("OBOT") or an Opioid Treatment Program ("OTP"); however, the drug Methadone may be legally prescribed and dispensed only when MAT is used in the context of an OTP. Id. at ¶¶ 15-16, 183.

OTPs must be certified by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), be properly accredited, and must comply with state and federal opioid treatment regulations. Id. at ¶¶ 19-21 (citing 42 C.F.R. §§ 8.12(f)(1), (f)(4), (f)(5) (regarding the provision of adequate and appropriate medical, counseling, and other treatment services); 42 C.F.R. § 8.12(g) (requiring adequate record keeping)). Relator alleges that counseling and therapy is "[o]ne of the most important aspects of OTP" and that the Government Healthcare Programs pay for substance abuse counseling and therapy in both individual and group settings. Id. at ¶¶ 22-23.

4

### 1. By Medicare

An OTP may submit a bill for a "bundled payment," rather than billing for individual services. Id. at ¶ 249. To do so, the OTP must furnish at least one "Opioid Use Disorder" treatment service. Id. at ¶¶ 250-251 (citing 42 C.F.R. § 410.67(b)(i)-(v)). These treatment services include medication and "individual and group therapy…." Id. at ¶ 250 (citing 42 C.F.R. § 410.67(b)(iv)); see also id. at ¶ 244. Additionally, 42 C.F.R § 410.67(d)(2) outlines two types of bundled payments – payments based on weeks where a patient received medication and payments based on weeks where a patient did not receive medication. Id. at ¶ 252. Relator alleges that Defendants bill Medicare for OTP services using bundled billing codes. Id. at ¶ 261.

### 2. By Other Payors

Relator alleges that Defendants also bill the other Government Healthcare Programs for OTP services. See id. at ¶¶ 292-305, 363-372 (generally outlining North Carolina's participation in Medicaid and that Defendants submitted claims for individuals who were eligible for both Medicare and Medicaid); ¶¶ 306-320, 373-379 (generally outlining the TRICARE medical benefits program available to active service members and others and alleging that Defendants "submit bills" to TRICARE); ¶¶ 321-330, 380-386 (generally outlining "Veterans Affairs Treatment of Opioid Use Disorder" and alleging that Defendants submit bills to the VA); ¶¶ 331-346,

387-393 (generally outlining grant funding provided through the 21st Century Cures Act used to reimburse OTP services provided to individuals without private insurance or Medicaid and alleging that Defendants have submitted bills for services provided to patients who have received Cures Act grants).

### C. Defendants' "Prior Fraud"

In April of 2014, the Department of Justice announced a settlement of FCA claims against CRC's predecessor, CRC Health Corp, related to allegations that it "knowingly submitted false claims by providing substandard treatment to adult and adolescent Medicaid patients suffering from alcohol and drug addiction at its facility in Burns, Tenn." Id. at ¶¶ 398-402.[3]

In May of 2019, the Department of Justice announced another settlement with CRC relating to the practice by Acadia's "treatment centers" of seeking reimbursement for moderate and high complexity laboratory drug testing which "they were not certified to perform, and did not, in fact, perform." Id. at ¶ 407. As part of the 2019 settlement, Acadia and CRC entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the United States Department of Health and Human Services ("HHS-OIG" or

---

[3] Relator has not provided additional information or documents regarding this settlement.

"OIG") to ensure compliance with Federal health care program requirements. See id. at ¶¶ 408-421.[4]

The CIA, required, among other things, that CRC provide training to CRC's medical staff regarding CIA requirements and federal healthcare program requirements, and that CRC develop a "disclosure program" to enable individuals to report potential violations of "criminal, civil, or administrative law." Id. at ¶¶ 424, 429; see also id. at ¶¶ 430-434 (regarding disclosure program). If, "after a reasonable opportunity to conduct an appropriate review or investigation of the allegations," Defendants determined that there had been a "Reportable Event," the CIA required Defendants to notify HHS-OIG. Id. at ¶ 435-437. The CIA defined a "Reportable Event" to include "(a) a substantial overpayment; [and] (b) a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized…." Id. at ¶ 436. In addition to any remedies independently available under Federal or State law, the CIA provided for stipulated monetary penalties in the event of a breach. Id. at ¶¶ 441, 445.

---

[4] During the hearing all parties agreed that the Court could consider the CIA in ruling on the Motion to Dismiss and the CIA was subsequently filed as a supplemental exhibit. Doc. 49; see also Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (stating that courts may take judicial notice of matters of public record, documents attached to the complaint, and documents attached to the motion to dismiss so long as they are integral to the complaint and authentic).

## D. Defendants' North Carolina Facilities

Relator is a Physician Assistant and the former Assistant Medical Director of Defendants' "Asheville facility." Id. at ¶ 39. While Relator was employed there, her job "was to handle physical assessments of patients and prescribe appropriate doses" of certain medications. Id. at ¶ 464. She was employed at the Asheville facility from January 2014 through December 2021. Id. at ¶¶ 77-80.

The Asheville facility provides behavioral health services through an OTP to patients, and "[t]herapy and/or counseling are integral parts of every patient's treatment plan." Id. at ¶¶ 465-467. "Upon information and belief, established patients are supposed to receive counseling at least once per month at Defendants' clinics" and new patients are supposed to be seen twice a month for counseling. Id. at ¶¶ 480-481.

Since at least September 2020, "Defendants' clinic" in Asheville has been copying and reusing "pre-prepared" group therapy notes to falsely reflect group therapy sessions that never occurred. Id. at ¶¶ 24-32, 508-510; see also id. at ¶¶ 484-489 (alleging various types of group therapy sessions never occurred, and that Relator's patients "told her that the Asheville facility was not providing group therapy"); ¶¶ 496-498 (regarding a group therapy session recorded on September 3, 2020 that did not actually occur); ¶¶ 501-506

(alleging that a March 3, 2021 group therapy note used the same language as the September 3, 2020 note and that the March 3 session did not occur).

Around March of 2021, Defendants "formalized the falsification of their group therapy notes at the Asheville facility through a process known as bibliotherapy." Id. at ¶ 33. Although bibliotherapy is a form of therapy in which a therapist provides a patient with reading material and then the patient comes back into the clinic to discuss the material with a counselor, Defendants began asking patients to respond to pre-printed forms that were never discussed in an individual or group therapy session. Id. at ¶¶ 34-36; see also id. at ¶¶ 516-525. "Instead, Defendants continued falsifying group therapy notes, which stated that the patients participated in group therapy sessions and discussed their responses to the worksheets with therapists and/or counselors." Id. at ¶ 37, see also id. at ¶¶ 529-530 (alleging language identical to that included in the September 3, 2020 note was used in previous group therapy notes).[5]

Relator asserts that she learned from the "Medical Director of Defendants' North Wilkesboro facility" that Defendants were also using false

---

[5] Relator also alleges that "since the beginning of the COVID-19 pandemic," Defendants have failed to "perform adequate individual therapy and counseling at the Asheville facility…" Id. at ¶ 39; see also id. at ¶¶ 553-555 (alleging individual counseling and/or therapy conducted by phone was inadequate and that "[f]requently, no actual therapy and/or counseling occurred during the call"); 646 ("Defendants also provided inadequate individual therapy to patients at the Asheville facility").

group therapy notes at that facility, id. at ¶ 41, and alleges, upon information and belief, that such conduct is occurring at "Defendants' facilities across the State of North Carolina and the United States." Id. at ¶ 43; see also id. at ¶¶ 572; 575 (alleging that the Clinic Director of the Asheville facility told Relator that "this conduct was occurring at other North Carolina locations, including Defendants' Pinehurst and Fayetteville locations").

Although Relator and the Medical Director of the North Wilkesboro facility notified their "Clinic Directors" of the fraud, Defendants took no corrective action. Id. at ¶ 42.

### E. Patient 6

"Patient 6" is a Medicare and Medicaid beneficiary who receives treatment through the Asheville facility's OTP. Id. at ¶¶ 582-584. Despite his initial treatment plan, which required Patient 6 to "participate in all program counseling requirements," Defendants never provided him with the option to participate in group therapy, and Patient 6 did not participate in any group therapy at any of Defendants' facilities. Id. at ¶¶ 585, 588, 591-592.

Patient 6's chart, however, "contains numerous group therapy notes, indicating that he participated in group therapy many times." Id. at ¶ 593; see also id. at ¶¶ 595-609 (alleging that a note showing that Patient 6 participated in group therapy on April 7, 2021 "was an exact duplicate" of a note previously used by other counselors for other patients); ¶ 618 ("Patient 6's records also

contain duplicate falsified group therapy notes for April 15, 2021; April 21, 2021; and April 28, 2021").

In July of 2021, Patient 6 met with a counselor to update his treatment plan. Id. at ¶ 622. At that time, Patient 6 had failed two previous drug screenings, reported that he was struggling to "stay abstinent," and expressed interest in group therapy. Id. at ¶¶ 623-625. His treatment plan was updated to indicate that he would "continue to attend counseling sessions through telehealth or in person sessions" and to note that Patient 6 "could benefit from attending group thearpy (sic) as well." Id. at ¶ 627. Relator alleges, upon information and belief, that Patient 6, though, did not receive any group therapy at the Asheville facility "at any point prior to Relator leaving her position as Assistant Medical Director in December 2021." Id. at ¶ 629.

Further, Relator alleges, upon information and belief, that Defendants submitted bills to Medicare and Medicaid for weekly bundles of OTP services including group therapy during every week in April 2021 and during the week of May 19, 2021. Id. at ¶¶ 630, 631. However, no group therapy was performed during any of these weeks. Id. at ¶ 632.

## III. Legal Standards

When considering a motion made pursuant to Rule 12(b)(6), the court, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff, determines "whether the complaint on its

face states plausible claims upon which relief can be granted." Francis v. Giacomelli, 588 F.3d 186, 189, 192 (4th Cir. 2009); accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009).

The court, however, is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com, 591 F.3d at 255; see Giacomelli, 588 F.3d at 192. That is, while "detailed factual allegations" are not required, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); accord Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); accord Consumeraffairs.com, 591 F.3d at 255. In short, the well-pled factual allegations must move a plaintiff's claim from conceivable to plausible. Twombly, 550 U.S. at 570; Consumeraffairs.com, 591 F.3d at 256.

Generally, "[s]ubstantive FCA claims must satisfy both Rule 8(a)'s plausibility requirement and Rule 9(b)'s particularity standard to survive a motion to dismiss." United States ex rel. Harbit v. Consultants in Gastroenterology, P.A., No. 3:19-cv-03403-JMC, 2021 WL 1197124, at *3 (D.S.C. March 30, 2021) (citing Universal Health Servs., Inc. v. U.S. ex rel.

_Escobar_, 579 U.S. 176, 195 n.6 (2016)). Failure to comply with Rule 9(b)'s pleading requirements may be treated as a failure to state a claim under Rule 12(b)(6). _Dunn v. Borta_, 369 F.3d 421, 426 (4th Cir. 2004).

"Rule 9(b) requires a plaintiff alleging fraud or mistake, like a False Claims Act relator, to 'state with particularity the circumstances constituting fraud or mistake,' though knowledge 'may be alleged generally.'" _U.S. ex rel. Taylor v. Boyko_, 39 F.4th 177, 189 (4th Cir. 2022) (quoting Fed. R. Civ. P. 9(b)). "These circumstances are often referred to as the 'who, what, when, where, and how' of the alleged fraud." _Id_. (quoting _United States ex rel. Wilson v. Kellogg Brown & Root, Inc._, 525 F.3d 370, 379 (4th Cir. 2008).

IV. **Discussion**

    A. **Relator's Claims**

Relator asserts that Defendants submitted claims which "expressly and/or impliedly falsely certified to the Government Healthcare Programs that they were" (1) providing "appropriate treatment" to individuals with Opioid Use Disorder and (2) complying with patient treatment plans, State and Federal law, "their certification and accreditations," "their provider agreements," and the CIA. _Id_. at ¶ 55; _see also id_. at ¶¶ 206-214 (generally regarding forms requiring Defendants "to understand and certify their compliance with all applicable Medicare laws, regulations, and program instructions as a condition of payment of Medicare reimbursements"); ¶¶ 216-

13

233 (generally regarding accreditation and certification); ¶¶ 656-737 (alleging that each time Defendants submitted a claim for individual or group therapy to a Government Healthcare Program, either as an individual bill or as a bundled bill, Defendants made express and/or implied certifications that they complied with Federal law, regulations, and treatment standards; North Carolina law; certification and accreditation requirements; provider agreements; and the CIA).

Relator further asserts that the Government Healthcare Programs paid Defendants based on these certifications, and that these certifications were material to payment decisions. Id. at ¶¶ 738-744; see also id. at ¶¶ 647-650 (generally alleging that Defendants engaged in a pattern and practice of falsifying group therapy records, necessarily leading to the submission of false and fraudulent claims which were paid by the Government Healthcare Programs).

Relator brings six claims under the FCA: a "presentment claim" under 31 U.S.C. § 3729(a)(1)(A), a "false record or statement" claim under § 3729(a)(1)(B), a conversion claim under § 3729(a)(1)(D), a "false certification" claim under § 3729(a)(1)(B), a "fraudulent inducement" claim under § 3729(a)(1)(B), and a "reverse false claim" under § 3729(a)(1)(G). Additionally,

Relator asserts a claim under the NC FCA.[6]

Defendants move to dismiss the Amended Complaint in its entirety.

## B. Presentment and False Record or Statement Claims

"Count I" of Relator's Amended Complaint sets forth a "presentment" claim pursuant to 31 U.S.C. § 3729(a)(1)(A), which provides that "any person who ... knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ... is liable to the United States Government for a civil penalty...plus 3 times the amount of damages which the Government sustains because of the act of that person."

"Counts II, IV, and V" of the Amended Complaint are labeled as "Use of False Record or Statement Material to a False Claim," "Submission of Express and Implied Certifications," and "Fraudulent Inducement," respectively. Doc. 26. Each of these claims is brought pursuant to Section 3729(a)(1)(B) which provides that "any person who ... knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ... is liable to the United States Government for a civil penalty...plus 3 times the amount of damages which the Government sustains because of the act of that

---

[6] The parties agree that the analysis under the FCA and the NC FCA is the same. See Doc. 43-1 at 6, n. 1; Doc. 45 at 11 n. 2; see also United States ex rel. Gugenheim v. Meridian Senior Living, LLC, 36 F.4th 173, 179 n.2 (4th Cir. 2022) ("The NCFCA largely parallels the False Claims Act and is interpreted consistent with it. N.C. Gen. Stat. § 1-616(c). We follow the parties' lead and discuss only the False Claims Act, although our analysis and conclusions apply equally to [relator's] NCFCA claim").

person." 31 U.S.C. § 3729(a)(1)(B).

During the hearing, Relator clarified that Counts I and II are based on alleged payments made by the Government Healthcare Programs *other than* Medicare. Relator additionally represented that Counts IV and V are more broadly based on Relator's position that every time Defendants submitted a claim for payment to any Government Healthcare Program, they made false direct or implied certifications that they had complied with applicable laws, regulations, treatment standards, certification and accreditation requirements, provider agreements, and the CIA.

"Roughly speaking, a presentment claim alleges that a defendant knowingly submitted a false claim to the government themselves. A false-record-or-statement claim alleges that a defendant knowingly made a false statement or produced a false record material to a false claim that was submitted to the government by someone else." United States ex rel. Nicholson v. MedCom Carolinas, Inc., 42 F.4th 185, 193 (4th Cir. 2022).

Under either theory, a relator must allege four elements: (1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or conduct "caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')." Harrison v. Westinghouse Savannah River Co., 176

F.3d 776, 788 (4th Cir. 1999); see also U.S. ex rel. Taylor v. Boyko, 39 F.4th 177, 188 (4th Cir. 2022) (quoting Harrison, 176 F.3d at 788). "Failure to adequately allege any of these elements dooms a claim." Taylor, 39 F.3d at 788.

### 1. Element One: False Statement or Fraudulent Course of Conduct

With respect to Defendants' Asheville facility, Relator has alleged that Defendants created notes for group therapy sessions that did not actually occur, and has cited specific case notes that were re-used on different dates for different patients. See e.g., Doc. 26 at ¶¶ 496-497, 501-505, 529-530, 598-609.

Regarding conduct in other North Carolina faciltiies, Relator has alleged that the "Medical Director of Defendants' North Wilkesboro facility" told Relator that group therapy notes were falsified at the North Wilkesboro facility and that the clinic director of the Asheville facility told Relator that Defendants were using false group therapy notes at the Pinehurst and Fayetteville locations. Doc. 26 at ¶¶ 572, 575.

Relator, though, has not alleged with sufficient specificity that these practices occurred at Defendants' other facilities. Rather, Relator alleges generally, upon information and belief, that this practice is "corporate policy" id. at ¶ 672, and that it is also occuring

> at Defendants' facilities across the State of North Carolina and across the United States, including but not limited to the following states: Alaska, Arizona, Arkansas, California, Delaware, Florida, Georgia,

Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin.

Id. at ¶ 581.

That is, Relator has not alleged sufficiently that group therapy records were falsified at any facility, other than Defendants' Asheville, North Wilkesboro, Pinehurst, and Fayetteville facilities. See United States ex rel. McClain v. Nutritional Support Services, L.P., No. 6:17-cv-2608-BHH, 2020 WL 2464655, at * 6 (D.S.C. March 16, 2020) (granting motion to dismiss where relator's allegations "baldly assert[ed] 'by information and belief, ... that the fraud as pled is being perpetrated at all [defendant] locations in multiple jurisdictions in the United States of America….'"); United States ex rel. Badr v. Triple Canopy, Inc., 950 F.Supp.2d 888, 900 (E.D. Va. 2013) ("Relator cannot use his allegations of a fraudulent scheme at one location involving one contract to create an inference that the scheme must have resulted in the submission of false claims at other locations governed by other contracts of which he lacked personal knowledge"), *reversed on other grounds*, 857 F.3d

174 (4th Cir. 2017).[7]

### 2. Element Two: Scienter

During the hearing, Defendants confirmed that the instant Motion does not challenge Relator's allegations as to the scienter element.

### 3. Element Three: Materiality

Under the FCA, the term "material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," 31 U.S.C. § 3729(b)(4).

In Universal Health Servs., Inc. v. U.S. ex rel. Escobar, 579 U.S. 176 (2016) the Supreme Court explained that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." Id. at 192. Further, "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's

---

[7] Defendants argue that Relator's allegations are not plausible on their face because "neither Medicare nor Medicaid requires group therapy, and Medicare's bundled payment system does not make it possible to bill for group therapy." Doc. 43-1 at 11; see also Doc. 43-1 at 13. This argument is discussed in the section pertaining to element three, below.

noncompliance." <u>Id</u>. "In sum," the Court concluded,

> when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

> <u>Id</u>. at 194-185.

The FCA's materiality standard is "demanding" because "[t]he [FCA] is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." <u>Escobar</u>, 579 U.S. at 194.

Although courts consider materiality based on "the particular facts of each case," <u>United States ex rel Rose v. Stephens Institute</u>, 909 F.3d 1012, 1020 (9th Cir. 2018), FCA claims may nonetheless be addressed on a motion to dismiss or at summary judgment. <u>Escobar</u>, 579 U.S. at 195, n. 6. As explained by one court:

> Courts may do so because the materiality standard "is a familiar and rigorous one," which must be pleaded

"with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b)." "For a false statement to be material, a plaintiff must plausibly allege that the ... violations are 'so central' to the claims that the government 'would not have paid [the] claims had it known of [the] violations.'" Material misrepresentations "[go] to the very essence of the bargain," or are "at the core" of a program…

State of Hawaii ex rel Torricer v. Liberty Dialysis-Hawaii LLC, 512 F.Supp.3d 1096, 1111 (D. Haw. 2021) (internal citations omitted).

Here, Relator's claims are premised primarily on Defendants' allegedly false assertions that they provided group therapy and, more broadly, that Defendants certified their compliance with applicable laws and other requirements each time they submitted a claim to any Government Healthcare Program.

More specifically, Relator alleges, upon information and belief, that Defendants submitted bills to Medicare, Medicaid, and other Government Healthcare Programs for OTP services including group therapy, see Doc. 26 at ¶¶ 630, 631, and that when doing so, certified that the billing information was true, accurate, and complete. See e.g., id. at ¶¶ 205-207, 209-213. Relator further alleges that Defendants' "false statements, implied certifications, and express certifications" were material to the Government Healthcare Programs' decisions to pay claims. See id. at ¶¶ 655, 661 ("Upon information and belief, if Government Healthcare Programs were aware of the falsity of Defendant's

21

express and/or implied certifications, they would not have reimbursed Defendants for individual and/or group therapy – including through [the] bundled payment process"); ¶¶ 674, 681, 699, 711, 719, 737 (each alleging that "[t]hese false and/or implied certifications were material to the Government Healthcare Programs' decisions to pay Defendants' claims for individual and/or group therapy").

However, considering the general nature of Relator's allegations regarding materiality, the undersigned is not persuaded that Relator has alleged with sufficient particularity that Defendants' false representations regarding the provision of group therapy or, more generally, their compliance with applicable laws and regulations, were material to any Government Healthcare Program's payment decisions. See United States ex rel. Porter v. Magnolia Health Plan, 810 F. App'x 237, 242 (5th Cir. 2020) (affirming the district court's conclusion that a contract that "contain[ed] broad boilerplate language generally requiring a contractor to follow all laws, which is the same type of language Escobar found too general to support" lacked materiality under the FCA); United States ex rel. Sirls v. Kindred Healthcare, Inc., 469 F. Supp 3d 431, 449-50 (E.D. Penn. 2020) ("Relator's references to boilerplate language conditioning payment under Medicare and Medicaid on compliance with all laws and regulations are not sufficient to satisfy the demanding standard established in Escobar").

#### 4. Element Four: Submission of a False Claim

As noted above, to state a presentment or false record claim, one of the things a relator must allege is that a false claim was *submitted* to the Government. United States ex rel. Grant v. United Airlines Inc., 912 F.3d 190, 197-200 (4th Cir. 2018); see also United States v. Kernan Hospital, 880 F.Supp.2d 676 (D. Md. 2012) ("In the oft-quoted parlance of the United States Court of Appeals for the Eleventh Circuit, '[t]he submission of a [false] claim is ... the *sine qua non* of a False Claims Act violation.'") (quoting United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002) (citation omitted)).

There are two ways a relator may make this showing.

"[A] plaintiff can allege with particularity that specific false claims actually were presented to the government for payment. This standard requires the plaintiff to, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Grant, 912 F.3d at 197 (internal citations, quotation marks, and modifications omitted); see also United States ex rel. McClain, No. 6:17-cv-2608, 2020 WL 2464655, at * 4 (D.S.C. March 16, 2020) ("the Fourth Circuit has cautioned against presuming, from the mere existence of a fraudulent scheme, that false claims have been submitted"); United States ex rel. Owens v. First Kuwaiti Gen. Trading &

Contracting Co., 612 F.3d 724, 732 (4th Cir. 2010) (Rule 9(b) exists to ensure that there is substantial evidence prior to discovery, considering a qui tam plaintiff's incentive to file suit "as a pretext to uncover unknown wrongs").

Alternatively, "a plaintiff can allege a pattern of conduct that would *necessarily* have led to submission of false claims to the government for payment." Grant, 912 F.3d at 197 (quoting United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 455–56 (4th Cir. 2013) (emphasis in Nathan)); see also U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 457 (4th Cir. 2013) ("[W]hen a defendant's actions, as alleged and as reasonably inferred from the allegations, could have led, but need not necessarily have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment"); United States ex rel. McClain v. Nutritional Support Services, L.P., No. 6:17-cv-2608-BHH, 2020 WL 2464655, at *5 (D.S.C. March 16, 2020) ("As an alternative to pleading representative false claims, a *qui tam* plaintiff in the Fourth Circuit 'can allege a pattern of conduct that would 'necessarily have led to submission of false claims' to the government for payment'") (quoting Grant, 912 F.3d at 197)).

### a. False Claims Actually Presented

During the hearing, Relator clarified that she was not relying on a representative false claim that was actually made, but was instead relying on

the alternative theory that a false claim was necessarily presented based on Defendants' pattern and practice.

### b. False Claims Necessarily Presented

Significantly, the Fourth Circuit has stated that allegations which "leave[ ] open the possibility" that a false claim was not presented to the government are insufficient to state a claim. Grant, 912 F.3d at 198 (allegations that "could have led to presentment" of a false claim were insufficient).

In this case, with respect to any claims paid by Medicare, Defendants argue that because their services were bundled into a single billing code that included various optional services – such as substance use counseling, individual and group therapy, and toxicology testing – Relator has not alleged adequately that any claims submitted by Defendants were "false or fraudulent." See Doc. 43-1 at 11 ("if a bundled code includes several optional services, not all of which are required, then failure to provide one service does not cause a false claim to be submitted"). During the hearing, Relator acknowledged that group therapy is not required in order to use bundled billing codes for Medicare payments. See also 42 C.F.R. § 410.67(d)(3) & (b)(i)-(v).

With respect to other Government Healthcare Programs, the Amended Complaint provides no specific information regarding any claims made to programs other than Medicare. Although the Amended Complaint references

patients other than Patient 6 who were falsely noted to have participated in group therapy, and further alleges generally that bills were submitted for group therapy sessions that never occurred, the Amended Complaint does not explain which of these individuals were associated with which Government Healthcare Programs. See Doc. 26 at ¶¶ 496, 501, 504, 505 (alleging Patients 1, 2, 3, and 4 did not receive group therapy); ¶ 513 ("[u]pon information and belief, Defendants submitted bills to commercial insurance companies and Government Healthcare Programs for these false and fraudulent group therapy sessions"); ¶¶ 529, 530 (alleging Patients 5 and 6 did not receive bibliotherapy as referenced in their treatment notes); ¶ 549 ("[u]pon information and belief, Defendants submitted bills to commercial or Government Healthcare Programs for this false and fraudulent bibliotherapy"); ¶¶ 601-609 (alleging that an identical treatment note appeared in the files of Patients 7, 8, 9, 10, 11, 3, and 12).

Accordingly, Relator's allegations are not sufficient to allege a pattern of conduct that would necessarily have led to the submission of a false claim to a Government Healthcare Program.

The undersigned will therefore recommend that Relator's presentment and false records claims, whether based on bundled billing or a fee-for-service claim model (Counts One, Two, Four, and Five), be dismissed.

### C. Conversion

A relator may bring an FCA claim "under a 'conversion' theory of liability against 'any person who has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property.'" U.S. ex. rel. Kasowitz Benson Torres, 285 F. Supp. 3d 44, 47 (D.D.C. 2017) (quoting 31 U.S.C. § 3729(a)(1)(D)). "For a defendant to 'know' that he is delivering or causing to be delivered 'less than all' of a certain property 'used, or to be used, by the Government,' he must necessarily also know that the property belongs to the [G]overnment." Id. at 55 (quoting U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist., 842 F.3d 430, 439 (6th Cir. 2016)).

Courts have analyzed the sufficiency of a relator's allegations supporting an FCA conversion claim under Rule 8(a), rather than Rule 9(b). See Harbit, 2021 WL 1197124 at *7 (observing that there are very few decisions considering FCA conversion claims, applying Rule 8 to test the sufficiency of relator's allegations, and denying motion to dismiss FCA conversion claim).

Here, the Amended Complaint alleges that "[b]y knowingly failing to actually provide group therapy and adequate individual therapy, Defendants delivered less than all the United States intended them to deliver when they failed to provide those therapy services and instead kept the reimbursements, bundled payments, and grant money for their own profit." Doc 26 at ¶ 767.

27

Relator's conversion claim appears to be redundant of her presentment and false record or statement claims discussed above. See United States of American ex rel. Govindarajan v. Dental Health Programs, Inc., No. 3:18-cv-00463-E, 2021 WL 3213709, at *6, n. 5 (N.D.Tex. July 29, 2021) (dismissing FCA conversion claim as redundant of relator's presentment and false records claims).

Further, under the less stringent pleading standard of Rule 8, Relator has not alleged facts sufficient to indicate that Defendants received payments from the Government Healthcare Programs based on an allegedly false statement that Defendants provided group therapy.

The Amended Complaint alleges generally that "[m]any of the Asheville facility's patients are beneficiaries of Government Healthcare Programs, including Medicare, Medicaid, TRICARE, VA, and Cures Act Grants." Doc. 26 at ¶ 463. The Amended Complaint also includes allegations that certain patients' notes incorrectly reflect that they received group therapy. However, the Amended Complaint does not tie any of these notes to a specific claim made to a particular Government Healthcare Program or to any payment received in response to that claim. See Doc. 26 at ¶¶ 496, 501, 503-505, 529-530, 540.

Finally, while the Amended Complaint provides more specificity with respect to Patient 6, Relator acknowledges that Patient 6 was a Medicare beneficiary, and that Medicare does not require that group therapy be given

before a provider may use bundled billing codes.

### D. Reverse False Claim

"Under § 3729(a)(1)(G), a 'person' who (1) 'knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government' or (2) 'knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government' is 'liable to the United States.' A claim under § 3729(a)(1)(G) is known as a 'reverse false claim,' because it 'reverse[s] the typical claim under the Act: instead of creating liability for wrongfully obtaining money from the government, the reverse-false-claims provision creates liability for wrongfully avoiding payments that should have been made to the government.'" United States v. Walgreen Company, 691 F.Supp.3d 297, 303-304 (E.D. Tenn. 2022) (quoting U.S. ex rel. Barrick v. Parker-Migliorini Int'l, Inc., 878 F.3d 1224, 1226 (10th Cir. 2017)); see also United States ex rel. Fadlalla v. DynCorp International LLC, 402 F.Supp.3d 162, 190 (D. Md. 2019); U.S. ex rel. Landis v. Tailwind Sports Corp., 160 F. Supp. 3d 253, 255 (D.C. Cir. 2016)) ("Direct false claims cause the United States to remit money directly to claimants, whereas reverse false claims facilitate the improper withholding of money or property to which the United States is legally entitled").

The FCA defines an "obligation" as "an established duty, whether or not

fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). An "obligation" envisions a specific duty outlined in a contract or statute, not "[c]ontingent obligations—those that will arise only after the exercise of discretion by government actors." Landis, 160 F. Supp. 3d at 268.

"As a matter of law 'the Government's ability to pursue reimbursement for overpayments or fraudulently induced payments does not constitute an obligation'" for purposes of a reverse false claim. Fadlalla, 402 F.Supp.3d at 191 (quoting Landis, 160 F. Supp. 3d at 269). In other words, a relator "cannot properly allege a reverse false claim that is premised on the same conduct" as claims under Sections 3729(a)(1)(A) and (a)(1)(B). Id. (citing U.S. ex rel. Branscome v. Blue Ridge Home Health Servs., Inc., No. 16-00087, 2018 WL 1309734, at *5 (W.D. Va. Mar. 13, 2018) ("reverse false claims may not be based on the same conduct as a plaintiff's claims under 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B)"); United States v. Berkeley Heartlab, Inc., 247 F. Supp. 3d 724, 733 (D.S.C. 2017) ("And of course, if the conduct that gives rise to a traditional presentment or false statement action also satisfies the demands of section 3729(a)(1)(G), then there would be nothing 'reverse' about an action brought under that latter section of the FCA") (citation omitted)); see also Harbit, 2021 WL 1197124, at *3 (dismissing reverse FCA claim as "redundant" where

plaintiff-relators alleged that after overcharging Medicare, Medicaid and TRICARE, defendants further violated the FCA by failing to return the overpayments); United States ex rel. Maharaj v. Estate of Zimmerman, No. 2020 WL 4501464, at *12 (D. Md. Aug. 5, 2020) (dismissing reverse false claim based on same allegedly fraudulent conduct where relator alleged that certain contracts required defendants to "repay the government principal, interest and liquidated damages for monies purloined by fraud"); Torricer 512 F.Supp.3d at 1119 ("the court agrees with the substantial authority holding that an actionable reverse false claim cannot be based on a defendant's failure to refund the same payment that was obtained by an actionable false claim").

Accordingly, to the extent Relator's reverse false claim is based on falsified group therapy records, the undersigned will recommend that this claim be dismissed.

Here, though, it appears that Relator's reverse false claim is, at least in part, based on the stipulated penalty provisions of the CIA, which Relator contends were triggered when Defendants failed to implement or enforce the CIA's "compliance, training, and disclosure requirements," failed to disclose a "Reportable Event" (the submission of false claims or Relator's report of fraud), and falsely certified that they were in compliance with the CIA. See Doc. 26 at ¶¶ 795-799; ¶¶ 721-728 (alleging that Defendants did not provide Relator with annual training, failed to provide her with information about the compliance

and disclosure program under the CIA, and that Relator's mulitple reports to the Asheville clinic director that "Defendants were engaging in fraud by falsifying group therapy records" were Reportable Events); ¶ 442 (a "material breach of th[e] CIA…constitutes an <u>independent basis</u> for CRC's exclusion from participation in the Federal health care programs") (emphasis in Amended Complaint).

The CIA provides that "[a]s a contractual remedy, CRC and OIG hereby agree that failure to comply with certain obligations as set forth in this CIA *may* lead to the imposition of…monetary penalties (hereinafter referred to as 'Stipulated Penalties')…" Doc. 49 at 22 (emphasis added). The CIA goes on to identify specific monetary penalities for particular violations. <u>See</u> Doc. 49 at 22-24. Additionally, the CIA provides that in the event of a "material breach," OIG may, in its discretion, seek to exclude CRC from participation in Federal health care programs. <u>See</u> Doc. 49 ¶X(C)(4); (D).

Courts have explained that "contingent exposure to penalties which may or may not ultimately materialize does not qualify as an 'obligation'" under the FCA. <u>United States ex rel. Schneider v. JPMorganChase Bank, National Association, et al.</u>, 878 F.3d 309, 315 (D.C. Cir. 2017) (citing <u>Hoyte v. American National Red Cross</u>, 518 F.3d 61, 67 (D.C. Cir. 2008); <u>Simoneaux v. E.I. duPont de Nemours & Co.</u>, 843 F.3d 1033, 1038 (5th Cir. 2016) ("contingent penalties are not obligations under the FCA")). In <u>Sturgeon v. Pharmerica Corp.</u>, 438

F.Supp.3d 246 (E.D. Pa. 2020), the court considered whether the stipulated

penalty provisions set out in a defendant's corporate integrity agreement with

DHH OIG could be the basis of a reverse false claim, and explained:

> courts have split on the question whether stipulated penalty provisions of a CIA are "obligations" for reverse false claims purposes. All agree that that [sic] "a breach of [a government] contract can give rise to an 'obligation' " under the reverse false claims provision. Further, CIAs are contracts with the government. Beyond that, the cases diverge. A few have concluded that the contractual nature of the stipulated penalties by itself makes them "obligations." Most, however, have looked beyond the fact of the contract to its terms, concluding that where stipulated penalties are contingent on the exercise of governmental discretion, they are not "obligations."
>
> The majority position is more persuasive. It is true that ordinarily, a contract with a standard liquidated damages clause creates a present obligation to pay upon breach, whether the nonbreaching party exercises its discretion to sue for enforcement or not. The minority position holds by analogy that even if a CIA conditions the payment of penalties on OIG's exercise of discretion—that is, even if the penalties become due only after OIG determines that they are appropriate—an obligation exists. The minority position, however, is "insufficiently attentive to the language" that is typical of CIAs. Unlike a standard liquidated damages clause, the CIA between PharMerica and the government provides that failure to comply with the CIA "may lead to the imposition of...monetary penalties." Similarly, it provides that "[u]pon a finding that PharMerica has failed to comply" with any term of the CIA "and after determining that Stipulated Penalties are appropriate," OIG will notify PharMerica of "OIG's exercise of its contractual right to demand payment of

the Stipulated Penalties." These terms do not describe an "established duty" to pay money to the government—at the time of breach, the penalties are not yet due. Instead, these contract provisions describe a possible future duty. Despite the contractual relationship between PharMerica and the government, therefore, these stipulated penalties are more akin to regulatory fines than to typical contractual liquidated damages. Because there is no "established duty" until the government exercises its discretion to demand payment, the stipulated penalties are not "obligations."

438 F.Supp.3d at 278-279 (internal citations and footnotes omitted).

The undersigned finds Sturgeon's discussion and conclusions to be persausive, particularly as the CIA here has similar language.

## V.    Recommendation

For the reasons set forth herein, the undersigned respectfully **RECOMMENDS** that Defendants' Motion to Dismiss (Doc. 43) be **GRANTED**, and Relator's Amended Complaint be **DISMISSED**.

Signed: July 27, 2023

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636, and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal.  See Thomas v. Arn, 474 U.S. 140, 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).